Boston Real Estate Board & others vs. Department of Public Utilities & another.

Quaker Building Co. vs. Same.

Suffolk.   March 5, 1956. — July 26, 1956.

Present: Qua, C.J., Ronan, Counihan, & Whittemore, JJ.

*Public Utilities. Electric Company. Constitutional Law,* Public utilities, Due process of law, Police power, Equal protection of laws. *Equity Pleading and Practice,* Intervention; Review of order of department of public utilities; Master: appointment.

In a suit in equity under G. L. (Ter. Ed.) c. 25, § 5, against the department of public utilities to review an order designed to eliminate a practice of purchasing electricity wholesale from a certain electric company for resale in competition with the company, it was proper to allow the company to intervene as a defendant.   [482]

In order to provide the independent judicial determination of both law and facts required on constitutional issues raised by a rate order of the department of public utilities, it was proper in a suit in equity under G. L. (Ter. Ed.) c. 25, § 5, for review of the order to appoint a master for a full hearing of evidence and finding of facts respecting those issues.   [482]

Upon a review of an order of the department of public utilities in this court under G. L. (Ter. Ed.) c. 25, § 5, facts found by the department respecting nonconstitutional issues were not open to redetermination.   [482]

Under G. L. (Ter. Ed.) c. 164, § 94, an order by the department of public utilities on March 4 that an electric company file certain amendments of its schedules on or before April 1 would make the amendments effective either on April 1 or May 1, depending on when the company filed them, and was not a nullity for want of an effective time of the amendments.   [483–484]

The department of public utilities had power under G. L. (Ter. Ed.) c. 164, § 94, to make an order designed to eliminate, with some exceptions, an existing practice whereby an electric company sold electricity wholesale for resale to occupants of a building or group of buildings in competition with the company.   [484–485]

G. L. (Ter. Ed.) c. 164, § 92A, does not require the department of public utilities to order an electric company to supply electricity in bulk for the purpose of resale to occupants of a building or group of buildings

in competition with the company, irrespective of whether a "permanent financial loss" to the company would result from such an order. [486–487]

Persons who during a period of many years engaged in profitable businesses of reselling to occupants of a building or group of buildings electricity purchased wholesale from an electric company, as permitted by the rate structure of the company authorized during that period, had no vested rights constitutionally protected against reasonable regulatory action by the department of public utilities in the public interest designed to eliminate generally such practice of purchasing wholesale for resale in competition with the company. [488–490]

An order by the department of public utilities designed to eliminate generally a practice of purchasing electricity wholesale from an electric company for resale to the occupants of a building or group of buildings, which had developed over a period of years in accordance with a rate structure of the company authorized as in the public interest under then existing conditions, could not be pronounced unreasonable or arbitrary where it appeared that, by reason of changed conditions, it was no longer in the public interest to permit such resale in competition with the company. [491]

Regulatory action of the department of public utilities designed to eliminate an existing practice of purchasing electricity wholesale from an electric company for resale in competition with the company, while continuing to permit furnishing of electricity wholesale by the company for resale in an area where it did not operate and the resale was not in competition with it, was a reasonable classification and did not deprive the competing resellers of equal protection of the laws. [491]

An order by the department of public utilities designed to eliminate generally an existing practice of purchasing electricity from an electric company wholesale for resale in competition with the company was not invalid by reason of ameliorating provisions permitting resale in certain instances but on terms which would yield to the company an approximation of the revenue it would have received had the reselling been discontinued, and permitting resale under special contracts filed with the department as provided in G. L. (Ter. Ed.) c. 164. § 94, even though no standards for such contracts were specified. [493–495]

Two BILLS IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on April 7, 1953, and April 29, 1953.

The suits were reported by *Wilkins, J.*

*William F. Byrne,* (*R. Gaynor Wellings & Clarence A. Roberts* with him,) for Boston Real Estate Board and others.

*Richard J. Walsh,* (*Robert S. Zollner* with him,) for Quaker Building Co.

*Matthew S. Heaphy,* Assistant Attorney General, for the department of public utilities.

*Frederick M. Ives, (Finley H. Perry* with him,) for Boston Edison Company.

WHITTEMORE, J. These are bills in equity under G. L. (Ter. Ed.) c. 25, § 5,[1] to review an order of the department of public utilities (the department) dated March 4, 1953, addressed to the elimination of the competitive resale of electricity purchased from Boston Edison Company (Edison) at wholesale rates. The plaintiffs in the first case are owners, managers and operators of rental real estate in Boston, who engage in or have an interest in the business of resale of electricity to tenants or others who can be served without crossing a public way (see G. L. [Ter. Ed.] c. 164, §§ 87, 88), and the Boston Real Estate Board, a corporation certain of whose members own, manage or operate buildings in Boston, acting in their own behalf and for other owners and operators of commercial properties in Edison's territory alleged to have a common interest with the plaintiffs. The plaintiff in the second case (Quaker) since its organization in 1911 has, as its chief business, sold steam and electricity to owners and occupants in the block bounded by Devonshire, Summer, High, Federal, and Franklin streets in Boston. Its customers are eighty-three in number, in twenty-one buildings, and only four of them are Quaker's tenants. Edison was allowed to intervene in each case. The cases, with a companion case (*Kargman* v. *Department of Public Utilities, post,* 497) were referred to a master.

A single justice denied motions to recommit the master's report and otherwise reserved and reported the cases for our determination of all questions of law and fact appearing on the record.

The department's findings show that the practice of resale, or submetering, arose from Edison's efforts in its development period to secure off-peak customers who could be served without corresponding increase in generating capacity.

---

[1] The substitution of a new § 5 by St. 1953, c. 575, § 1, took effect September 1, 1953, and does not apply to "any final decision, order or ruling made prior to said effective date."

It was advantageous to Edison and its existing customers, largely residential, for Edison to obtain additional revenue at little additional expense by offering wholesale rates to induce self generators of electricity, including the many "block plants," five hundred in number in 1912, to cease business and buy Edison current. Most of these plants were eliminated but a number of the owners remained in the business of within-the-block or within-the-building distribution and others were attracted to it.

As this occurred and the balance of supply and demand changed with the great growth of the use of electricity, Edison concluded that this resale hurt its revenues and beginning in 1930 Edison from time to time took various formal and informal steps to discourage and restrict the practice. The department stated views adverse to the practice in 1947 in *Re A. W. Perry Inc.* D. P. U. 7697 (denial of a petition to order Edison to supply alternating current in place of direct, for resale) and again in 1949 in *Re Boston Edison Co.* D. P. U. 8228 (the Rate R case in which a special higher rate for resellers was disapproved). Edison then filed a new amended schedule and, following hearings in respect of that schedule, the subject order was entered.

The department took note of the development and disapproval of the practice elsewhere and in its conclusions found and ruled that the practice of competitive resale is fundamentally unsound and against the public interest, that it results in the utility supplying current to competitors at rates which deprive it of revenue which the utility must obtain by addition to the bills of other customers if it is to receive a just return, that Edison is threatened with expansion of the practice, that the order will not mean an increase in Edison's net earnings, that Edison and the department are not estopped, and that Quaker's position, though different in certain aspects, "must fall with the rest."

The order, dated March 4, 1953, and the conforming schedule filed by Edison on March 17 to be effective April 1, 1953, provide (paragraph 18) that Edison after one year shall

not, without the department's approval, supply electricity for resale except by way of rent inclusion, a term referring to arrangements whereby the tenant pays for current by paying his rent unaffected by extent of use, and except in special cases stated.

· The order manifestly contemplates that in the usual case the reseller will change to multiple metering, which term means a separate meter for each of the group comprised of the former reseller and his former customers. It provides however (7 [b]) for a limited use of series metering (a term which refers to the use of a master meter to measure all the current going into the building and separate meters for billing the tenants at usual retail rates), and a determination of the charge to the holder of the master meter by a computation related to the difference between the total on the master meter and the total on the tenants' meters. Series metering may be used in those cases where the building has been wired therefor before the order date and the "landlord in good faith notifies the company that rewiring for the installation of multiple metering equipment would be impracticable."

The special exceptions to the prohibition of the sale of electricity for resale permit sales (1) to municipal light plants and to electric companies whose customers are outside Edison's territory; (2) as provided in a special contract filed with the department under c. 164, § 94; (3) as lawfully directed and required by the department under c. 164, §§ 92 or 92A; and (4) at locations of resale existing July 1, 1951, where the customer has refused or failed to rewire for series or multiple metering. There is a provision in paragraph 18 (4) for the rate of charge in such cases which is designed, as the department has stated, to be "a rate made up of the sum of the estimated rates which would be collected from the building itself and the individual tenants involved if they were severally served direct, including the sum of the estimated demands." The other provisions in the order and schedule so far as material are referred to below.

EDISON'S INTERVENTION.

It was proper to allow Edison to intervene as a party defendant. Manifestly Edison is at interest. Justice is served and the court assisted by its presence as a party. The procedure on certiorari is irrelevant. G. L. (Ter. Ed.) c. 249, § 4. While the proceedings are in this court as an appeal, the appeal is from an order in proceedings in which Edison was a party. Our jurisdiction is in equity (c. 25, § 5). There can be no doubt of our power to allow such intervention.

THE REFERENCE AND THE MASTER'S REPORT. THE
DEPARTMENT'S RULINGS.

Edison appealed from the appointment of the master and objected to the master's receiving any evidence other than the record and transcript of the proceedings in the department. The order being in the nature of legislative action in the rate making field it was necessary that the court "act upon its own independent judgment as to both law and fact" in the issues involved in "a claim of confiscation or of other violation of constitutional right" (*Opinion of the Justices*, 328 Mass. 679, 687), and it was appropriate to appoint a master to find the relevant facts. *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80, 89. *Opinion of the Justices*, 328 Mass. 679. *New England Telephone & Telegraph Co.* v. *Department of Public Utilities*, 327 Mass. 81. *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Insurance*, 329 Mass. 265, 271. *Ohio Valley Water Co.* v. *Ben Avon Borough*, 253 U. S. 287. The master properly ruled that he was required to receive evidence bearing on the constitutional questions.

Apart from constitutional questions there is no basis for a redetermination of facts in this court. *Lowell Gas Co.* v. *Department of Public Utilities*, 324 Mass. 80, 84–85, and cases cited. The master, acting under a broad rule ("to hear the parties and their evidence"), received additional

evidence, not to "contradict findings of fact by the department" but in order to "report facts pertinent to claims by the plaintiffs that the department's order was unlawful on other grounds than those of constitutional prohibitions." Although there was no occasion for the receipt of this evidence, in the view we take of these cases no one has been harmed. For reasons hereinafter stated we rule that the order of the department is lawful, and, on the nonconstitutional issues, we so rule on the facts found by it. The plaintiffs may not complain that, at their offer and urging, additional facts or aspects of facts tending to support the lawfulness of the order are available to us as findings in the master's report.

So far as recommittal was sought for further findings by way of conclusion from facts found, it would not be necessary now as the facts found are available to us. The additional facts asked to be found on recommittal would not be significant in our view of the case.

There is no occasion to pass on specific objections (that is, exceptions — see *Pearson* v. *Mulloney*, 289 Mass. 508, 514) to the master's report. In the following paragraphs we state the important findings on which we rely. We have not given weight to any which we do not find supported. To any extent that our rulings differ from those made by the master, the former control. The purpose of rulings of law by the master to show the principles of law which he has deemed applicable and has followed in deciding facts (*First National Bank* v. *Harrison*, 271 Mass. 258, 263) has been well served here.

It will be unnecessary to deal separately with the rulings and refusals to rule of the department. Each has been considered in connection with the issues to which it relates.

THE EFFECTIVE DATE OF THE ORDER.

General Laws (Ter. Ed.) c. 164, § 94, as amended by St. 1939, c. 178, § 1, provides that "An order by the department directing a change in any schedule filed shall have

the same effect as if a schedule with such changes were filed by the company, and shall become effective from such time as the department shall order." The subject order in this respect provided that Edison "file, on or before April 1, 1953, new supplements amending its M. D. P. U. No. 54 modifying the same as follows: . . . ."

The plaintiffs in the first case now contend that this order, appealed from by them, is a nullity, that no one is aggrieved by it, and that we are therefore without jurisdiction. We disagree. Section 94 also provides that the company may file schedules amending its filed schedules of rates, prices and charges, and that "Unless the department otherwise authorizes, the rates, prices and charges set forth in such a schedule shall not become effective until the first day of the month next after the expiration of fourteen days from the filing thereof." Edison's compliance with the subject order of March 4, 1953, would mean that the provisions of the schedule would be effective either April 1, 1953, or May 1, 1953, depending upon whether Edison filed the required schedule before March 18. The result is the same as though the department had directed changes to take effect on April 1, 1953, if Edison should make the required filing before March 18, and otherwise to take effect on May 1. This is a sufficient order by the department of the effective time of the changes directed by the department. See *Perth Amboy* v. *Board of Public Utility Commissioners*, 98 N. J. L. 106; *S. D. Warren Co.* v. *Maine Central Railroad*, 126 Maine, 23.

THE POWER OF THE DEPARTMENT TO ENTER THE ORDER.

The plaintiffs in the first case contend that the statute (§ 94) gives the department jurisdiction only over "rates, prices and charges" as stated in schedules in prescribed form, and over changes therein, but that the order is a regulation of the practice of resale and is therefore beyond the department's power. Neither § 94 nor the order is, in our view, to be so narrowly construed. Rate practices as

well as rate scales may be regulated under a power to prescribe rates. *Florida Power & Light Co.* v. *State*, 107 Fla. 317, 321–322.

The amendment of § 94 in 1927 (St. 1927, c. 316, § 2) significantly broadened the power of the department. The department recommended the amendment to cause § 94 to read substantially as now, in order to give the department "jurisdiction of the *entire rate structure* [emphasis added]." (1927 House Doc. No. 1020, page 8.)

Section 94 requires the filing of "schedules . . . showing all rates, prices and charges . . . with all forms of contracts thereafter to be used in connection therewith." It gives the department jurisdiction not only over the stated rates, prices and charges for various classifications of service, and the relationship between classifications, but also over reasonably related terms and conditions stated in the service contract or the filed schedules. See *Ambassador, Inc.* v. *United States*, 325 U. S. 317, 322, note 3; *Campo Corp.* v. *Feinberg*, 279 App. Div. (N. Y.) 302, affirmed 303 N. Y. 995 (New York Public Service Comm., case No. 14279).

Under Edison's prior schedule the plaintiffs were informed that they could get power unrestrictedly at wholesale rates to service their tenants. It was certainly appropriate, and it was lawful, to use an amendment of the schedule to inform them of drastic restriction of the conditions under which power would thereafter be furnished for such purpose and large price increases therefor.

THE EFFECT OF G. L. (TER. ED.) c. 164, § 92A.

COMPETITION BETWEEN EDISON AND QUAKER.

Quaker filed a petition in the proceedings of the department in which the subject order was entered asking as one alternative that the department issue an order under G. L. (Ter. Ed.) c. 164, § 92A (which authorizes the department to order a supply of electricity in bulk), directing and requiring that Edison supply Quaker with electricity upon

legal and reasonable terms and conditions. The subject order in effect denies this.

We hold that § 92A does not give Quaker or others similarly situated a right to require that electricity be furnished them for resale in competition with Edison. The permissive form of this section and of the companion § 92 is significant. So also is the provision that such an order if made shall be "upon such terms and conditions as are legal and reasonable." The basis for any regulation of the supply of electric current is the State policy, in the general interest, of encouraging a monopoly of supply. (See *Weld* v. *Board of Gas & Electric Light Commissioners*, 197 Mass. 556.) If there can be one or several within-the-block or within-the-building reselling competitors of Edison there can be many. As the department has said, "Such a situation would be intolerable . . . ."

The controlling policy in the interpretation of § 92A is to be found in the fact of regulation and in such a provision as § 87 which prohibits the use of public ways to a competing electric utility without the consent of the aldermen or selectmen after notice and public hearing.

Quaker refers to 1930 House Doc. No. 1200. This report of the department recommended a bill, which with some amendments became § 92A, "to make it indisputable that . . . [§ 92] applies to wholesale contracts and covers the situation where a wholesale company may refuse to sell power to an operating company which has no other economically practicable source of supply" (pages 70–71). Quaker was then qualified as a reporting electric company and Doc. 1200, which was a widely ranging report, listed, in its comprehensive statement of the existing companies in the State, the independent companies. This list included Quaker, together with six nonelectric manufacturing companies engaged in selling current generated in excess of their own needs. The enactment of § 92A in this setting did not show a policy that independent companies shall be assured of electricity *for the purpose of competing with their suppliers.*

The able brief for Quaker contends, however, that Quaker is not a competitor of Edison as it has not sought to get customers from Edison, but on the contrary brought its customers to the use, through Quaker, of Edison current. We pass the effect of the allegation of Quaker's amended bill of complaint herein that "From the time of its organization in 1911, Quaker openly competed with Edison for electricity customers in the territory . . . [of its block] . . . ." Plainly there *is* competition between two distributors in the presently significant meaning of the word which perhaps is the sense that Quaker had in mind in its allegation. Edison's wires are in the streets surrounding Quaker's block available to supply Quaker's customers with no substantial extension of mains. Some tenants in some of the buildings in which Quaker serves most of the tenants are Edison customers. The essential aspect of opportunity of choice by the consumer is present. The competitive aspect is not, as Quaker contends, the same as that between Edison and Boston Gas Company in its exercise of its franchise in Charlestown. Edison has no wires in Charlestown and could not supply any material number of Boston's customers in Charlestown, if any whatever, without an extension of its main wires into that territory and action by the city council under § 87 granting it a franchise there.

It is unnecessary to rest the lawfulness of the order of the department under § 92A on its finding that requiring the supplying of electricity for resale would result "in permanent financial loss" to Edison within the meaning of these words in § 92A forbidding an order to supply if such would be the result. The rate structure of Edison, and we suppose all regulated electric utilities, is such that whether a particular service and a given rate means "loss" to the supplier depends in part upon other factors than the allocated cost of wages, materials, overhead, and other cost items. Edison's case here is in brief that in 1912 there was a "gain" to it in selling in bulk, even to resellers, at below the going rate for most of its customers (which presumably reflected its "costs") in order to get an increase in the off-

peak use of its generators, but that in the present era it is a "loss" to it so to sell to resellers because of change in relevant factors. We prefer, as it is unnecessary, not to consider whether this change in public interest can be deemed to show a "loss" to Edison under § 92A or whether the concept of a loss is otherwise supportable. It is significant, however, in determining that resale to competitors is not in the public interest that the department has found that the net increase in Edison's annual revenue from an end of the practice of resale to tenants will be about $1,000,000, and that there is little likelihood of self generation of electricity by former resellers.

THE EFFECT ON THE ORDER OF CONSTITUTIONAL PROVISIONS.

THE CLAIM OF VESTED RIGHTS.

The order changes a State created frame of reference in which the plaintiffs have been able to conduct profitable businesses for many years and thereby affects the value of property used in the businesses and affects the obligations of outstanding contracts with others than Edison made in the course thereof. What the plaintiffs have enjoyed is in substance a perquisite of location and occupation dependent upon the circumstance that for a period it was found to be in the general public interest for Edison to maintain, without limitation in respect of competitive use of current bought, a rate structure that gives a very substantial discount to wholesale purchasers. This circumstance and the concomitant rate structure had the collateral effect of giving to owners of certain property, strategically located, State supported monopolies of business opportunity. There has been no constitutional assurance to the plaintiffs that State regulation of Edison would continue to be carried out so as to make likely, or sure, the continuance of these special opportunities for profit.

The duty of service is owed to consumers and not to dealers. *Brand* v. *Water Commissioners of Billerica*, 242 Mass. 223, 228. "Each demandant of service "claims only

through the public . . . ." *Weld* v. *Board of Gas & Electric Light Commissioners*, 197 Mass. 556, 559. The contest here is over the application rather than the validity of the fundamental principles that the "right of freedom to contract in general is subject to reasonable legislative control under the police power," *Attorney General* v. *Prudential Ins. Co.* 310 Mass. 762, 766; *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349, 357, quoted in *New England Telephone & Telegraph Co.* v. *Brockton*, 322 Mass. 662, 666; *Home Building & Loan Association* v. *Blaisdell*, 290 U. S. 398, 438, quoted in *General Outdoor Advertising Co. Inc.* v. *Department of Public Works*, 289 Mass. 149, 210, and that reasonable and nonarbitrary action under the police power may be taken although it may diminish or destroy without compensation the value of property not actually taken. *Callender* v. *March*, 1 Pick. 418, 429–432. *Mugler* v. *Kansas*, 123 U. S. 623. *Chicago, Burlington & Quincy Railroad* v. *Chicago*, 166 U. S. 226. *New Orleans Public Service, Inc.* v. *New Orleans*, 281 U. S. 682, 687. *Connor* v. *Metropolitan District Water Supply Commission*, 314 Mass. 33, 36–37. *United States Gypsum Co.* v. *Mystic River Bridge Authority*, 329 Mass. 130, 135.

For reasons stated below we hold the order reasonable and not arbitrary. There is nothing in Quaker's claim that the order in effect will take its profitable business of reselling electricity and give it to Edison without compensation and will destroy its steam supply business and that this is the same for constitutional purposes as an actual taking. The master has rightly stated that this cannot be found to be the result in fact. The legal principle is inapplicable.

There is nothing in the contention that Edison and the department have so acted that vested legal or equitable rights have arisen in the continued receipt of electricity from Edison at wholesale rates. It is undisputed that Edison sought and encouraged reselling customers in the earlier period and coöperated with them. But the master found that Edison never represented that the resale privilege would continue forever and that for twenty-five years the

resellers' contracts have bound them to pay for service "in accordance with the company's terms and conditions . . . as they exist from time to time and are filed . . . ." The possibility existed of change in the conditions which for a time resulted in regulation favorable to the purchase of electricity for competitive resale. The possibility of change in the regulations was implicit at all times and was confirmed by action of Edison and the department over a number of years beginning in 1930. We need not pause to consider whether, since all customers and the public have an interest in all rates, the terms and conditions on which a regulated utility must furnish service could in any circumstances be determined or affected by estoppel or analogous principles. Nor need we decide what the effect would be of a change in the regulatory background of the resale contracts made startlingly soon after important changes had been made by new Edison customers.

We have considered carefully Quaker's contention, based on its decision in 1916 to take on as a customer the newly built Rice building, and to take Edison current rather than buy larger generating equipment, as well as its other claims to special treatment. But we see nothing to suggest that any vested rights arose in Quaker because of any of the facts found, or any facts which make the general principles on which we base this opinion inapplicable to Quaker.

"Petitioners have no vested rights, statutory or otherwise, in the practice of submetering . . . ." *Campo Corp.* v. *Feinberg,* 279 App. Div. (N. Y.) 302, 306, affirmed, without opinion, 303 N. Y. 995. *Sixty-Seven South Munn, Inc.* v. *Board of Public Utility Commissioners of New Jersey,* 106 N. J. L. 45, affirmed 107 N. J. L. 386, certiorari denied 283 U. S. 828.[1] See (not submetering cases) *Birmingham* v.

[1] Other decisions showing the ending or disapproval of resale in other States are *Re Potomac Electric Power Co.* D. C. P. U. C. (1929), P. U. R. 1929B, 600, *Karrick* v. *Potomac Electric Power Co.* Supr. Ct. (1931), P. U. R. 1932C, 40, *Lewis* v. *Potomac Electric Power Co.* Ct. of Apps. (1933) 64 Fed. (2d) 701, *Florida Power & Light Co.* v. *Florida,* 107 Fla. 317, *Re City of Fulton,* Mo. P. S. C. P. U. R. 1930D, 11, *Rogers Iron Works, Inc.* v. *Public Service*

*Southern Bell Telephone & Telegraph Co.* 234 Ala. 526, 533, 534; *Brooklyn Union Gas Co.* v. *New York,* 50 Misc. (N. Y.) 450, 461–463; *United States Light & Heat Corp.* v. *Niagara Falls Gas & Electric Light Co.* 47 Fed. (2d) 567, 570.

THE ORDER IS REASONABLE AND NOT ARBITRARY.

So far as it is a question of fact the master's finding that the order is not arbitrary and unreasonable is fully supported by the evidence; so far as it is a matter of law, we so rule. We think it is enough to support this conclusion to have found that it is no longer in the interest of the other customers of Edison or the general interest that there be a profit yielding rate structure available to Edison's competitors. The large amount of additional net revenue found to accrue to Edison under the order shows that the spread between wholesale and retail rates is greatly more than is warranted by differences in direct costs between wholesale and retail distribution. If there is such a concept in the complex field of utility rate making, the rate now to be ended for competitors of Edison does not appear as innately reasonable apart from the special conditions which brought it about and have now ended. We are not concerned with the continued justification of the wholesale rate to noncompetitors. It is not arbitrary or unreasonable to classify them differently. It does not deprive Quaker of equal protection of the laws to allow Edison to continue to sell current at wholesale rates to Boston Gas Company for resale to its Charlestown customers.

While it may not be significant whether Edison is

*Commission of Missouri* [water], Mo. Supr. Ct. (1929), P. U. R. 1929E, 293; 323 Mo. 122, *Ex Parte M. W. Munson Water Works* [water], La. P. S. C. (1949), 80 P. U. R. (N. S.) 188, *Re W. F. Cobb,* Colo. P. U. C. (1949), 78 P. U. R. (N. S.) 54, *D. L. Stokes & Co. Inc.* v. *Georgia Power Co.* Ga. P. S. C. (1947), 71 P. U. R. (N. S.) 15, *Edgar Brothers Co.* v. *Atlanta Gas Light Co.* [gas], Ga. P. S. C. (1946), 63 P. U. R. (N. S.) 86, *Department of Public Service of Washington* v. *Puget Sound Power & Light Co.* Wash. D. P. U. (1937), 20 P. U. R. (N. S.) 457, *Pennsylvania Public Utility Commission* v. *Philadelphia Electric Co.* Pa. P. U. C. (1942), 42 P. U. R. (N. S.) 126, *Ambassador, Inc.* v. *United States* [telephone], 325 U. S. 317, 322, *Tweed* v. *Delaware Power & Light Co.* Del. P. S. C. (1955), 11 P. U. R. (3d) 226, 232–233; Del. Sup. Ct. (1955), 11 P. U. R. (3d) 239. (There are other decisions in some of these States.)

threatened with expansion of the practice of resale, the facts found support the conclusion that the threat of expansion, absent restriction or prohibition of the practice, does exist. The economics of the situation are persuasive.

Whether or not material, there is support for the finding that Edison's net earnings are not going to be increased as a result of the order. The department has power over existing rates (c. 164, § 93) and over proposed rates (§ 94). Also Edison, in the subject proceedings, has committed itself to the department to devote "the proceeds of any recovery . . . for the benefit of those customers who take service under the residence rates, unless the department should request a different use."

Quaker argues forcefully that a special exception for it is required because of its unique position among the plaintiffs as a qualified electric company and in other respects. Special treatment for Quaker might have been warranted. We do not need to determine this and intend no suggestion. But an exception for Quaker might have raised very serious factual and legal questions of where to draw the line between Quaker and others. It was appropriate and lawful for the reasons stated, and not unreasonable or arbitrary, to apply the order to Quaker just as to all other resellers.

Nor does it make the order unlawful that it might have been open to the department to order that *all* resellers in their precise status as of a given date be exempted from the order, particularly, as the argument goes, since most of the resellers take direct current, and there is increasingly strong demand for alternating current only. See *In the Matter of Commonwealth Edison Co.* #40745 Ill. Comm. Comm. 1/29/53, C. C. H. Utilities Law Rep. 1953 et seq. par 16, 514. The department was not required to find it in the public interest for Edison not to receive for a substantial period the large increase in annual revenue here involved.

Other claims of unreasonableness and arbitrariness are discussed below. We have considered each of the many specifications to the point even though not mentioned.

THE EFFECT OF PARAGRAPHS 7 (b), 18 (4) AND 19.

Most if not all the arguments of unlawfulness based on paragraphs 7 (b) and 18 (4) stem from the assumption that the plaintiffs have a right to a supply of current for use in competitive resale. Our holding that there is no such right is sufficient answer.

These are optional provisions to ameliorate the effect of the prohibition of sale of current for competitive resale. As such they are not to be judged as offered rates in stated schedules, and any deviations therein from rate making principles, such as may have been stated in the Rate R decision, would not be controlling. Perhaps the order would have been valid without any options allowing current to be supplied under series metering or to resellers who are located in Edison territory. *Brand* v. *Water Commissioners of Billerica*, 242 Mass. 223, 228. *General Outdoor Advertising Co. Inc.* v. *Department of Public Works*, 289 Mass. 149, 205–210. Instead of that the department has provided for no sale on series metering or to resellers in competitive territory except on terms which, within the limits imposed by the inherent difficulties, including that of determining the demands of each user in the absence of separate meters, will yield to Edison an approximation of the revenue it would have had if series metering or reselling had been given up.

We have considered each of the specified ways in which, under these paragraphs, the rate computations or the charges will differ from the rate computations and charges which would prevail if metering were different or the computations different, and all specifications of uncertainty, inexactness and unevenness in operation of the provisions. They do not invalidate the order.

Under paragraph 7 (b) the master meterer may install a meter to measure his own use and demand if he wishes, or he may change the whole installation to multiple metering. The expense of so doing, not being a basis of valid complaint against the order, does not give a right to have an alterna-

tive to multiple metering which under all conditions of use of current is precisely or substantially equivalent thereto in dollar impact.

The primary significance of paragraph 18 (4) is in its assurance to all reselling customers of Edison that they will not be deprived of electricity at some price even if they do not shift to multiple or series metering within the specified year. The master found that it is designed to "provide Edison with a method of collecting . . . about as much revenue as if that customer had given up resale." It would be immaterial in the circumstances, including this finding, if it were true, as additionally found by the master, that the department also sought to prescribe terms making failure to give up the practice "so disadvantageous that building owners . . . would be compelled to adopt either multiple or series metering." This does not show, as contended, that the department has imposed a penalty. At most the charging provisions of 18 (4) operate to resolve in Edison's favor the difficulties involved, under the conditions it allows, in determining what Edison's revenue would be if those conditions had been prohibited. That, we hold, the order may lawfully do.

We agree with the master that paragraph 18 (4) applies to Quaker notwithstanding the use of the word "tenant." The controlling intent to treat Quaker as are the other plaintiffs, is manifest.

Paragraph 19, directing Edison to purchase meters on stated terms, does not make the order unlawful. This is not for Edison's benefit. It is another provision to lessen the impact of a police power change, permitted but not required. *Connor* v. *Metropolitan District Water Supply Commission,* 314 Mass. 33, 37.

### THE EFFECT OF PARAGRAPH 18 (2).

Quaker contends that it is deprived of equal protection of the laws in that paragraph 18 (2) allows resale under special contracts filed with the department under G. L. (Ter. Ed.)

c. 164, § 94, and there are no specified standards under which such contracts may be allowed. Other plaintiffs contend that the practice of resale cannot be the subject of a special contract under § 94.

For reasons already stated we hold that § 94 does give the department power to determine whether Edison by a special contract may furnish electricity for resale. What will be determined in such a case in substantial part is whether a wholesale rate (either the regularly scheduled wholesale rate or a special one for the special case) may be charged for certain electric service. This is sufficiently related to the regulation of rates, prices and charges to be within the intendment of § 94.

We find no unlawfulness in paragraph 18 (2) because of the lack of standards. Section 94 of c. 164 provides for rates, prices and charges under special contracts. This statutory provision was a sufficient reason for the inclusion in the order of paragraph 18 (2). The controlling consideration of the public interest in the exercise of the department's statutory regulating power is implicit throughout the statute. It is the standard which supports the grant of power over rates and regulations in general, and it is not necessary to specify further. *Boston* v. *Edison Electric Illuminating Co. of Boston*, 242 Mass. 305. *Scannell* v. *State Ballot Law Commission*, 324 Mass. 494, 501. See *Krupp* v. *Building Commissioner of Newton*, 325 Mass. 686, 690. That different treatment for different classes of customers, reasonably classified, is not unlawful discrimination is axiomatic in rate making. We note but need not stress for this point, that discrimination among customers, absent competition between them or other qualifying circumstances, may not be unlawful. *Brand* v. *Water Commissioners of Billerica*, 242 Mass. 223, 226–227. *Fitchburg Railroad* v. *Gage*, 12 Gray, 393, 399. It may be that a particular customer because of some or all of such factors as size, location or nature of business is properly placed in a separate class. The statute allows for this. The complaint here is the absence of standards for the exercise of the power in respect of approving

provisions of special contracts which will facilitate resale. The department's findings indicate some of the applicable criteria in determining the public interest; including on the one hand the adverse effect of resale in competition with the utility and on the other the desirability of increasing custom up to the generator capacity under special conditions.

The now existing special contracts do not show that the power will be exercised arbitrarily. The department has expressly declared that the public interest in respect of such contracts as allow for resale will, because of the subject order, be determined by it. Section 94 gives the department the necessary power. It is immaterial that under the different conditions existing prior to adoption of the subject order the department has not heretofore taken affirmative action in respect of any filed special contract. To any and the full extent that applicable rules of law now or at any time hereafter require consistency of treatment for customers who stand in like aspect we must assume it will be afforded.

The department made findings as to two special contracts. We agree with the department that they do not show or forecast unreasonable discrimination.

Quaker fears that the department will allow, under special contracts such as now exist, the continued sale of electricity at bulk rates to Boston & Maine Railroad and Quincy Market Cold Storage for resale by them since they are large customers, big enough to install their own generators, and contends that Quaker may protest now in advance of knowing what will in fact be done, because in the meantime this order will put Quaker out of business. This contention does not make a point against the order or against paragraph 18 (2) in our view. As stated, the master's conclusion was justified that it cannot be found that Quaker will cease business because of the order and we cannot assume what the department will do or know what it should do, not having all the premises for action that it will have when the issue arises. *Queenside Hills Realty Co.* v. *Saxl*, 328 U. S. 80, 84–85. Nor can we say that the probability of self gen-

eration of electricity by large users is necessarily a completely irrelevant factor in determining the classification for rate purposes into which such users shall fall.

The department has indicated that it contemplates the use of paragraph 18 (2) to give "Edison and its customers, under supervision of the department, time to iron out . . . difficulties [in making changes under the order] as they come up . . . [and that] Edison can allow any customer who has cooperated in good faith to meet the deadline, but who is unable for some reason to do so, to have additional time to rearrange his system." This we hold will be a reasonable use of the provision.

The department also said, "Such latitude as the department might give in this matter would be adequate to protect vested contract rights . . . ." This is an additional proper reason for the inclusion of paragraph 18 (2).

A decree is to be entered in each case denying the motion to recommit the master's report, confirming the report and dismissing the bill of complaint.

*So ordered.*