HOLYOKE WATER POWER CO. *vs.* CITY OF HOLYOKE
& another.

Hampden.   May 4, 1965. — June 25, 1965.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Public Utilities. Municipal Corporations,* Municipal utility plant. *Equity Jurisdiction,* Public utilities, Declaratory relief.

Under G. L. c. 164, the Department of Public Utilities is given sufficient powers of supervision over municipally owned and operated electric plants so that a privately owned company actively engaged in the manufacture and sale of electricity in a city in competition with the municipal plant there was not entitled to bring a suit in equity against the city for declaratory relief with respect to an allegedly discriminatory rate filed by the city with the department pursuant to c. 164, § 58, where the company had not first sought relief through the department's regulatory powers.

BILL IN EQUITY filed in the Superior Court on December 13, 1963.

The suit was heard by *Meagher,* J., on a plea in bar.

*John F. Moriarty* for the plaintiff.

*Maurice J. Ferriter* for the defendants.

CUTTER, J.   The plaintiff (the company) brings this bill for declaratory relief against the city and against the city's

gas and electric commission (see St. 1922, c. 173). A plea in bar was sustained on the grounds stated in the margin.[1] By final decree the bill was dismissed. The company appealed. The facts are stated as alleged in the bill.

The city "owns and operates its own gas and electric department . . . and is actively engaged in the manufacture and sale of electricity" in Holyoke. The company is "also actively engaged in the manufacture and sale of electricity" in Holyoke, in competition with the city for customers purchasing "lots of 100 horsepower or greater." By St. 1947, c. 289, § 1, the city was authorized to "sell and distribute steam generated by its municipal gas or electric plants to any person" within the limits of the city, and for such purposes has all the powers and is subject to the liabilities of a city in the operation of a municipal lighting plant. See *Adie* v. *Mayor of Holyoke,* 303 Mass. 295, 298–299; *Municipal Light Commn.* v. *Taunton,* 323 Mass. 79, 84.

Holyoke has installed a steam distribution system and is engaged in selling steam within a large portion of Holyoke's industrial area. Among the persons to whom the city sells steam "are users of electricity for whose electric business the . . . [company] and the . . . [c]ity . . . are engaged in active competition." The city completely dominates the market for steam in the part of the industrial area served by its system and, through its control of the public ways, is able to maintain an effective monopoly of the sale of steam in that area.

Prior to March 1, 1963, the city "sold steam on an equal and uniform basis to steam customers in accordance with a rate schedule filed pursuant to" G. L. c. 164, § 58, but, "ef-

---

[1] In a report of material facts, the trial judge found no facts. He merely recorded that he sustained the plea in bar on the grounds stated in pars. 6, 7, and 8 of the plea, which (with par. 5) may be summarized, "5. That the [c]ity . . . is . . . subject" to G. L. c. 164 "and is regulated by the Commonwealth . . . (Department of Public Utilities [the department]). 6. That the . . . [c]ity . . . has reported all rates regarding sales of electricity and/or [sic] steam . . . to the . . . [d]epartment . . . . 7. That the . . . [company] has never complained to the . . . [d]epartment . . . regarding the rate schedule on file with that [d]epartment, and . . . has never sought a hearing before the [d]epartment . . . to contest the . . . rate schedule. 8. That it is necessary for the . . . [company] to question the rate schedules with the [d]epartment . . . prior to a [b]ill in [e]quity."

fective as of March 1, 1963, the [c]ity . . . altered its . . . rate schedule by offering a discount of five percent . . . to those of its steam customers who purchase their electrical requirements as well as their steam requirements from the . . . [c]ity . . . [and] the [c]ity . . . has . . . in fact granted a discount of five percent . . . to those of its steam customers who purchase their electrical requirements from the . . . [c]ity.''

The purpose and effect of the discount is to enable the city "to use its economic power in the steam market, for the purpose of compelling users of electricity to purchase their electrical requirements from the . . . [c]ity . . . and to . . . restrain . . . the competition that has previously existed between the . . . [company] and the . . . [c]ity.'' It is alleged "that by its . . . discount the [c]ity . . . unreasonably and unlawfully discriminates against those of its steam customers who choose to purchase their electrical requirements from'' the company. The company "is also a steam customer of the . . . [c]ity'' and, since it does not purchase its electrical requirements from the city, the discount is not granted to the company. Consequently it is asserted that the discount discriminates against the company as well as against other steam customers.

The city contends that the department, by virtue of G. L. (Ter. Ed.) c. 164, § 58[2] (taken together with St. 1947, c. 289,

---

[2] Section 58 was amended after the filing of the bill in respects not here relevant. See St. 1964, c. 401. Prior to the 1964 amendment, § 58 read, in part, "There shall be fixed schedules of prices for . . . electricity, which shall not be changed oftener than once in three months. Any change shall take effect on the first day of a month, and shall first be advertised . . . . No price in said schedules shall, without the written consent of the department, be fixed at less than production cost as it may be defined from time to time by order of the department. Such schedules of prices shall be fixed to yield not more than eight per cent per annum on the cost of the plant, as it may be determined from time to time by order of the department, after the payment of all operating expenses, interest on the outstanding debt, the requirements of the serial debt or sinking fund established to meet said debt, and also depreciation of the plant reckoned as provided in section fifty-seven, and losses; but any losses exceeding three per cent of the investment in the plant may be charged in succeeding years at not more than three per cent per annum. The . . . electricity used by the municipality for any purpose except street lighting shall be charged for in accordance with the prices in the fixed schedules. The . . . electricity used . . . for street lighting shall be charged for at a cost to be determined as follows: [then follows a formula not here relevant].''

in respect of the sale of steam), is given "jurisdiction, not only over the stated rates, prices, and charges for various classifications of service, and the relationship between classifications, but also over reasonably related terms and conditions stated in the fixed schedule." Support for this contention is found in the circumstance that the provisions of G. L. c. 164, §§ 34–69 (as amended), give to the department various regulatory powers, in addition to those conferred by § 58, with respect to municipal electric plants, and require that the department be furnished with various types of information relating to such plants. See, for example, §§ 37, 38, 43, 47, 52, 54, 57 (as amended through St. 1963, c. 347, § 3), 59 (as amended through St. 1953, c. 502), 60, 63, and 68. General Laws c. 164, §§ 65 and 66,[3] emphasize various aspects of similarity of municipal plants to privately owned public utilities in respect of the application of at least parts of the chapter. Cf. *Howard* v. *Chicopee*, 299 Mass. 115, 121–122 (holding that a city is not an "electric company" within the meaning of G. L. [Ter. Ed.] c. 164, § 94A; since amended by St. 1941, c. 400, § 1). Section 69 gives to this court "jurisdiction *on petition of the department* or of twenty taxable inhabitants of the town to compel the fixing of prices by the town in compliance with" §§ 57 and 58, "to prevent any town from . . . operating . . . a gas or electric plant *in violation of any provision of this chapter, and generally to enforce compliance with the . . . provisions thereof* relative to the . . . distribution of . . . electricity by a town" (emphasis supplied). In the context of c. 164, the term "town" should be taken to include "city." G. L. c. 4, § 7, Thirty-fourth. See *Waltham* v. *Mignosa*, 327 Mass. 250, 253.

The applicable provisions of c. 164, already cited, indicate to us that the department has been given sufficient

---

[3] Section 65 reads, "A town authorized by special act to construct, purchase, lease, establish or maintain a gas or electric plant shall be subject to this chapter, so far as the same may be applicable." Section 66 reads, "This chapter, and all ordinances or by-laws of any town acting under its provisions relative to the manufacture, use or distribution of gas or electricity, or to the quality thereof, or to the plant or the appliances therefor, shall apply to such town, so far as applicable."

powers of supervision (see *Adie* v. *Mayor of Holyoke,* 303 Mass. 295, 298; see also *Municipal Light Commn.* v. *Taunton,* 323 Mass. 79, 83) over municipally owned electric plants,[4] their service practices, and charges to make it appropriate for a person, affected by practices of such a plant alleged to be discriminatory, to apply to the department for relief in the first instance before seeking relief in the courts. It will be noted that c. 164, § 69, quoted in part above, gives only to the department, or to twenty taxable inhabitants, the right granted by that section to seek enforcement of compliance with the chapter.

We need not now determine whether and to what extent c. 164, §§ 65 and 66 (fn. 3), may make applicable to municipally owned utilities principles like those set out in c. 164, § 94,[5] but not stated, at least in comparably explicit detail, in c. 164, § 58. It is sufficient for present purposes to state (1) that the department by c. 164, is given substantial power to supervise municipally owned utilities and to ask a court to require a city's compliance with c. 164; (2) that exercise of the department's regulatory powers may afford to the company some measure of relief (if it is entitled to any relief) and, in any event, may affect the scope and character of any judicial relief which may be given, and (3) that, in this controversy between a municipality con-

---

[4] For discussions of the regulation of municipally owned utilities, see Reese, State Regulation of Municipally Owned Electric Utilities, 7 Geo. Wash. L. Rev. 557, 584–585; Kneier, State Supervision over Municipally Owned Utilities, 49 Col. L. Rev. 180, 188, 198. Cf. Barnes, Economics of Public Utility Regulation, pp. 828–831; Rhyne, Municipal Law, §§ 23–7, 23–8; Note 41 Yale L. J. 116. For discussions of the extent to which some State public service commissions have been given power to regulate rates and other practices of municipally owned utilities, see *Kennebunk, Kennebunkport & Wells Water Dist.* v. *Wells,* 128 Maine, 256, 259; Mosher and Crawford, Public Utility Regulation, p. 498 et seq. See also *O'Donnell* v. *North Attleborough,* 212 Mass. 243, 245–247; *Mrugala* v. *Boston,* 330 Mass. 707, 708; *Re Dixon,* 123 Vt. 111, 115; *Los Angeles Metropolitan Transit Authy.* v. *Public Util. Commn.* 59 Cal. 2d 863, 869–870; annotations, 10 A. L. R. 1432, 18 A. L. R. 946, 76 A. L. R. 851, 127 A. L. R. 94.

[5] Section 94, of course, gives to the department, with respect to a privately owned company, "jurisdiction not only over the stated rates, prices, and charges for various classifications of service, and the relationship between classifications, but also over reasonably related terms and conditions stated in . . . the filed schedules." See *Boston Real Estate Bd.* v. *Department of Pub. Util.* 334 Mass. 477, 485.

ducting a public utility and a competing regulated public utility, exhaustion of the possibilities of departmental action should precede independent action (not expressly authorized by c. 164, § 69) in the courts to prevent alleged discriminatory practices.[6]   The department has not had opportunity to determine whether to take action under its general powers, or under G. L. c. 164, § 69.   Until it acts, there is no occasion to consider whether the discount arrangement based upon combined sales of electric current and steam is discriminatory, an improper competitive practice, or an unreasonable exploitation of the city's semi-monopoly as a utility.

*Decree affirmed.*

---

[6] For a general discussion of rate discrimination, see McQuillin, Municipal Corporations (3d ed.) §§ 34.97–34.105, 35.37.   See also *Boston Real Estate Bd.* v. *Department of Pub. Util.* 334 Mass. 477, 495–496; *Hall* v. *Swanton,* 113 Vt. 424, 426–428 (municipally owned utility's discrimination invalid); *Re Dixon,* 123 Vt. 111, 115–116; *Roanoke* v. *Fisher,* 193 Va. 651, 658; Nichols, Public Utility Service and Discrimination, c. XXVII, esp. pp. 881–901; Hale and Hale, Competition or Control, 106 U. of Pa. L. Rev. 641, 654–659; 110 U. of Pa. L. Rev. 57, 68–73; annotation, 40 A. L. R. 2d 1331.   For discussions of "tying" arrangements in other contexts, see *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 605–615; *Northern Pac. Ry.* v. *United States,* 356 U. S. 1, 5–7; *United States* v. *Loew's Inc.* 371 U. S. 38, 44–51; Rowe, Price Discrimination under the Robinson-Patman Act, p. 150 et seq. Toulmin, Anti-Trust Laws, vol. 4, §§ 18.1, 24.18, vol. 5, §§ 12.21–12.25; Kronstein, Miller, and Schwartz, Modern American Antitrust Law, p. 80; Turner, Validity of Tying Arrangements under the Antitrust Laws, 72 Harv. L. Rev. 50.