## BOARD OF ASSESSORS OF HOLYOKE *vs.* STATE TAX COMMISSION & another.[1]

Suffolk. December 5, 1968. — January 15, 1969.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Taxation*, Personal property: machinery, exemption; Classification of corporation. *Holyoke Water Power Company*. *Corporation*, Manufacturing company, Electric company, Business corporation law. *Way*, Public: pole, franchise. *Statute*, Construction.

Upon review of a decision of the Appellate Tax Board by this court in accordance with the standards set out in G. L. c. 30A, § 14 (8), questions of burden of proof have no significance. [233]

Holyoke Water Power Company, in 1964 predominantly a manufacturer and distributor of electric power but also engaged in orthodox business, was not precluded from then being, within G. L. c. 63, § 38C, a corpora-

---

[1] Holyoke Water Power Company, allowed by the board to intervene.

Board of Assessors of Holyoke *v.* State Tax Commission.

tion "subject to" c. 156, the general business corporation law, by the provision of c. 156, § 2, that c. 156 should not apply to corporations organized for the purpose of carrying on the business of a "canal" company, although one of the purposes for which the power company had been organized by St. 1859, c. 6, had been to maintain "canals" in connection with a dam previously constructed by another company and transferred to the power company, since the primary objective of the 1859 act had been to create a water power company. [234–235]

Holyoke Water Power Company, created by St. 1859, c. 6, as a water power company, and subsequently authorized by statutes to manufacture electricity and to engage in a limited distribution of electric power, including sale of electricity to its own subsidiary, an electric company, but not expressly obliged to serve all interested customers and not given any exclusive territory to serve, was not in 1964, when it was predominantly a manufacturer and distributor of electric power but also engaged in orthodox business, precluded from being, within G. L. c. 63, § 38C, a corporation "subject to" G. L. c. 156, the general business corporation law, by the provision of c. 156, § 2, that c. 156 should not apply to corporations organized for the purpose of carrying on the business of an "electric light, heat or power company" [236–237]; nor did the provision of c. 156, § 2, excluding "corporations empowered to manufacture, store, transmit, sell or distribute power" from control under c. 156 of the right to increase or decrease their capital stock, preclude the power company, which in 1924 and 1938 had been permitted by the Legislature to take action with respect to its stock "pursuant to" c. 156, "relating to business corporations," from being "subject to" c. 156 [237–238].

The provision of G. L. c. 156, § 2, as amended through St. 1931, c. 426, § 255, that c. 156, the general business corporation law, should not apply to corporations having the right "to take land . . . by eminent domain or to exercise franchises in public ways granted by" any municipality did not preclude Holyoke Water Power Company, in 1964 predominantly a manufacturer and distributor of electricity but also engaged in orthodox business, from then being, within c. 63, § 38C, a corporation "subject to" c. 156 notwithstanding its having been granted locations in public ways in Holyoke for its poles for the transmission of electricity, since the grant of the pole locations neither amounted to a right to take land by eminent domain nor constituted a franchise in public ways. [240–241]

Holyoke Water Power Company, once mainly a hydraulic power company which by 1964 had become predominantly a manufacturer and distributor of electric power, developing real estate in furtherance of its electrical business, and engaging in orthodox business, was not precluded from then being, within G. L. c. 63, § 38C, "subject to" the general business corporation law, c. 156, by the fact that in various aspects the company was subject to c. 164, relating to electric companies. [241–242]

Where statutes applying to a company predominantly a manufacturer and distributor of electric power but also engaged in orthodox business,

and its history, rendered uncertain whether it was a "manufacturing corporation" or an "electric company," contemporary administrative classification of it as a "manufacturing corporation" was entitled to weight. [243–244]

A decision of the Appellate Tax Board, affirming the State Tax Commission's classification in 1964 of Holyoke Water Power Company, predominantly a manufacturer and distributor of electric power but also engaged in orthodox business, as a "domestic manufacturing corporation" within G. L. c. 63, § 38C, as amended, so that under c. 59, § 5, Sixteenth (3), its machinery in Holyoke was exempt from taxation by the city, was affirmed on appeal where the decision was consistent with the way in which the power company had been treated by the Legislature and by corporation and tax administrative officials for many years and was permitted by applicable statutes. [244]

APPEAL from a decision of the Appellate Tax Board.

*James D. St. Clair* (*Robert J. Richards, Jr., & A. Frederick Richard* with him) for Board of Assessors of Holyoke.

*John F. Moriarty* (*John S. Begley, Lane McGovern & John S. Hopkins, III*, with him) for Holyoke Water Power Company, intervener; *Paul N. Gollub*, Special Assistant Attorney General, for State Tax Commission, also with him.

CUTTER, J. This appeal from a decision of the Appellate Tax Board (the board) is a further stage in the litigation which was before this court on procedural issues in *Assessors of Holyoke* v. *State Tax Commn.* 351 Mass. 394 (hereafter referred to as the first *Holyoke* case). The question for decision is whether the Commissioner of Corporations and Taxation, for the purposes of G. L. c. 59, § 5, Sixteenth (3) (a),[2] properly classified (as of January 1, 1964) Holyoke Water Power Company (HWPC) as a "domestic manufacturing corporation" as defined in G. L. c. 63, § 38C.[3]

---

[2] By G. L. c. 59, § 5, Sixteenth (3), as amended through St. 1957, c. 541, a "domestic manufacturing corporation" is exempt from local taxation upon its property other than "real estate, poles and underground conduits, wires and pipes." Its machinery is thus not subject to local taxation. By § 5, Sixteenth (1), "machinery used in manufacture" is subject to local taxation if owned by a Massachusetts corporation subject to taxation under c. 63 other than a domestic business corporation (as that term is defined in G. L. c. 63, § 30) or a domestic manufacturing corporation (fn. 3). See § 5, Sixteenth (2), permitting the local taxation of the "machinery used in the conduct of the business" of a domestic business corporation as defined in c. 63, § 30.

[3] Chapter 63, § 38C (as amended through St. 1937, c. 383, § 1; see later amendment by St. 1964, c. 723, § 3), reads in part, "Every corporation *organized under or subject to* . . . [G. L. c. 156] which is engaged in manufacturing shall, for the purposes of this chapter, be deemed to be a domestic manufac-

After the first *Holyoke* case, the board heard the assessors' appeal on the merits.  It affirmed the State Tax Commission's classification of HWPC as a domestic manufacturing corporation.  The board made rulings and extended findings. The assessors have again appealed to this court.

The important issue is whether HWPC is (see fn. 3) a corporation "organized under or subject to" G. L. c. 156, the general business corporation statute: If it is, it is within the language of c. 63, § 38C, for it is engaged in manufacturing and selling electricity and steam, as the assessors correctly concede.  See *Boston & Maine R.R.* v. *Billerica,* 262 Mass. 439, 447–449.  See also *Commissioner of Corps. & Taxn.* v. *Assessors of Boston,* 321 Mass. 90, 94, 97; *Assessors of Boston* v. *Commissioner of Corps. & Taxn.* 323 Mass. 730, 740–751; *Boston Gas Co.* v. *Assessors of Boston,* 334 Mass. 549, 554.  Pertinent language of G. L. c. 156, § 2, is set out in the margin.[4]  The assessors contend that the italicized language (following [A], fn. 4) prevents HWPC from being subject to c. 156.

---

turing corporation.  Every domestic manufacturing corporation shall be taxed in the same manner . . . as a domestic business corporation, except in so far as the determination of the excise under this chapter may be affected by reason of the exemption from local taxation of the machinery of a domestic manufacturing corporation" (emphasis supplied).  The 1964 amendment added to § 38C a reference to the new corporation act, c. 156B.  This was not applicable to HWPC in 1964.  See St. 1964, c. 723, § 6.  See also fn. 17.

[4] Section 2 (as amended through St. 1931, c. 426, § 255, and prior to its amendment by St. 1964, c. 723, §§ 5, 7, and St. 1965, c. 685, §§ 55, 57) reads (emphasis supplied) in part: "Except as expressly made applicable by reference in other chapters, this chapter shall not apply to corporations organized for the purpose of carrying on . . . [various forms of banking and surety operations] or . . . the business of an insurance company, railroad, electric railroad, street railway . . . telegraph or telephone company, [A] *gas or electric light, heat or power company, canal,* aqueduct or water *company . . . or to any other corporations which now have or may hereafter have the right to take land* within the commonwealth *by eminent domain* or to *exercise franchises in public ways granted by* the commonwealth or by *any* county, *city* or town.  It shall apply to all other domestic corporations having a capital stock and heretofore or hereafter established either by general or special law for the purpose of carrying on business for profit except as provided in chapter one hundred and fifty-seven and except . . . [exceptions not applicable] and [B] this chapter shall govern the amount of . . . estate which any corporation subject to it may hold, and the right to increase or decrease its capital stock, notwithstanding the provisions of any special act of incorporation, *except in the case of corporations empowered to manufacture, store, transmit, sell or distribute power.*"  The bracketed letters are inserted only for convenient reference to the language following them, respectively, especially the italicized words.

A. EARLY HISTORY OF HWPC.

HWPC was organized by St. 1859, c. 6, "for the purpose of . . . maintaining the dam across the Connecticut River, heretofore constructed by the Hadley Falls Company [Hadley], and one or more locks and canals in connection with the . . . dam, and of creating and maintaining a water-power, to be used by . . . [HWPC] for manufacturing and mechanical purposes, and to be sold or leased to other persons . . . for like purposes."[5]

Hadley had been incorporated by St. 1848, c. 222, to maintain a dam across the Connecticut River and to create a water-power to be used by it for manufacturing purposes and to be sold and leased to others. The Proprietors of Locks and Canals on the Connecticut River (the Proprietors), a corporation formed in 1792, in 1848 deeded their land and water rights to Hadley, reserving navigation rights through the canal. Hadley maintained the locks and canals from 1848 to 1859. In 1859 Hadley had financial difficulties and its dam and its land, locks, and canals on the South Hadley side of the river were transferred to HWPC. Hadley was dissolved by St. 1873, c. 327. By St. 1862, c. 150, the Proprietors were released from all obligation to keep their locks and canals in repair. The last toll for using the canal for navigation was charged by HWPC in 1862.

Prior to 1859, Hadley had engaged in the distribution of illuminating gas. HWPC continued this business after it acquired Hadley's assets. In 1888 HWPC was authorized to generate and sell electricity in Holyoke for light and

---

[5] HWPC was also made subject to the "liabilities and restrictions" set forth in Rev. Sts. (1836) c. 38 and c. 44, the business corporation laws of that time, and to St. 1857, c. 276. Section 2 of the 1859 act gave HWPC power to purchase, use, and deal with the property of Hadley. Section 3 gave HWPC, for the purpose of keeping its locks and canals in repair, authority to charge, with the consent of the Proprietors of the Locks and Canals on the Connecticut River, the same tolls charged by such Proprietors. The 1848 statute incorporating Hadley gave that corporation power to maintain its dam, locks, and canals for "creating a water-power . . . for manufacturing . . . and also for the purposes of navigation." Statute 1859, c. 6, did not contain any such provision with respect to HWPC as the last phrase referring to navigation.

power. It did so until 1902, through a company known as Holyoke Electric Light and Power Company. Then the city of Holyoke acquired HWPC's entire gas and electric plants. (St. 1891, c. 370, esp. § 15). HWPC continued to maintain the dam and canals constituting its hydraulic power system and carried on various other businesses, which from 1859 had included the provision of water power and process water for mills along the canal system. In addition to its hydraulic system, HWPC in 1905 began the development and expansion of a hydroelectric system. It also has engaged extensively in real estate development.

## B. HWPC's Hydroelectric Development.

By St. 1903, c. 350, § 1, HWPC was authorized to manufacture electricity for power purposes within Holyoke and South Hadley and to sell and distribute it in any city or town in Hampden County or Hampshire County, with the approval of the mayor and aldermen or of the selectmen, as the case might be. Such sales were restricted (a) to sales of 100 horsepower (hp.) or more under written contract that the "purchaser shall use such electricity in his own business only, and upon his own property," and (b) to sales to communities in the two counties which had established or might establish a municipal lighting plant. Section 3 of the 1903 statute gave HWPC authority to maintain poles and wires in, through, or over any streets, subject to R. L. (1902) c. 122, §§ 1–5, and c. 121, §§ 26, 27 (see fn. 15), and "all other general laws now or hereafter applicable."[6]

HWPC built its plant and first sold electricity to one customer in 1906. It acquired a second customer in 1913. It was granted pole locations by the city of Holyoke in 1905.

---

[6] Section 3 also provided for underground wires and that HWPC "shall in all respects, except as otherwise provided herein, be subject to all general laws now or hereafter in force applicable to corporations engaged in the manufacture or sale of electricity for power, except street railway companies." By § 4 the rights granted were to cease unless HWPC "shall install a plant and furnish electricity . . . within three years after the passage of" the act. For discussion of the sections of the Revised Laws specifically mentioned in the 1903 act see fn. 15.

The 1903 act was amended by St. 1909, c. 152, to permit HWPC to sell electricity "in any quantity to, and for any use on the premises of, any tenant" of a mill in Holyoke acquired by HWPC during the first six months of 1909 or built by HWPC after January 1, 1909, or thereafter acquired by HWPC through foreclosure of a purchase money mortgage of which HWPC was the mortgagee (so long as HWPC remained owner or mortgagee). Pursuant to this new authority HWPC had built by 1917 five new mills and supplied them with electricity.

By St. 1926, c. 147, HWPC was authorized to sell or lease any of its electric properties to a subsidiary, Holyoke Power and Electric Company, an electric company. Each company was authorized to sell current to the other with the approval of the Department of Public Utilities (D.P.U.), subject in the case of sales and distribution in Holyoke and South Hadley to the restrictions in the 1903 act. HWPC was authorized to accept capital stock in its subsidiary in payment for property sold to it at the fair value of assets sold as determined by the D.P.U.

## C. STATUTES AFFECTING HWPC's CAPITAL STRUCTURE.

Increases of HWPC's capital stock have been authorized by special acts on three occasions. St. 1889, c. 72. St. 1924, c. 54. St. 1938, c. 183. The 1889 act merely provided for an increase to an amount not exceeding $1,200,000. The 1924 and 1938 statutes each provided in § 1 that the "increased capital stock shall be issued for cash, at not less than par, pursuant to the provisions of . . . [G. L. c. 156] relating to business corporations." The 1938 act provided (§ 2) that changes in the par value of stock "shall be approved and filed in the manner provided in . . . [G. L. c. 156] with respect to similar amendments of articles of organization of *other corporations subject to said chapter*" (emphasis supplied). The 1938 act (§ 3) authorized HWPC to issue such bonds and notes, payable more than a year after the date thereof, as the Commissioner of Corporations

and Taxation (not the D.P.U.) may determine to be necessary for its purposes.[7]

In 1938, more than half of HWPC's revenues came from the sale of electricity, its single largest source of revenue after 1925. Following the 1938 act, HWPC twice (1949 and 1956) sold debentures with the authority of the Commissioner. The D.P.U. in each instance took the position that it had no jurisdiction in the matter.

In 1963 HWPC changed the par value of its shares by amendments purporting to comply with G. L. c. 156.

## D. HWPC's 1964 ACTIVITIES.

The board made detailed findings concerning HWPC's activities in 1964. They are summarized below.

HWPC then was engaged in manufacturing and distributing electricity principally to wholesale, municipal, and industrial customers. It sold hydraulic power and process water. It carried on a district steam business and real estate operations for the purpose of promoting industrial and residential development and its own electrical business. The municipal customers are the electric light departments of Chicopee (see *Howard* v. *Chicopee*, 299 Mass. 115) and Holyoke. With the Holyoke department HWPC is in competition for industrial customers. It is in no area the exclusive vendor of electricity and everywhere is in competition with other suppliers.[8]

---

[7] In 1924 and in 1938 various amendments were rejected by one or the other house of the Legislature in the course of the enactment of the statutes. The rejected amendments would have subjected HWPC to G. L. c. 164 (relating to electric companies) as to the matters dealt with by the statutes and to some supervision by the D.P.U. See 1924 Senate Journal, 247; 1938 Senate Journal, 533, 543; 1938 House Journal, 629, 661–662, 679, 727. See also 1924 House Doc. No. 1245; 1938 House Doc. No. 1756.

[8] HWPC's generating plants are all in Holyoke. During 1964, the company had about seventy-four industrial customers for electricity, two municipal customers, and one wholesale customer, its subsidiary Holyoke Power and Electric Company. Of the industrial customers, twenty-five were tenants of HWPC.

HWPC's gross income by departments for 1964 was:

| | |
|---|---|
| Electric Revenues | $11,542,109 (92.9% of total) |
| Steam Sales | 253,159 |
| Hydraulic Revenues | 183,069 |
| Real Estate Revenues | 258,492 |
| Interest and Dividend Revenues | 182,331 |
| Total | $12,419,160 |

The hydraulic system consists mainly of a dam running 1,020 feet between Holyoke and South Hadley, and four and a half miles of canals through the industrial part of Holyoke. Customers draw water from the canal system for power and manufacturing uses under contracts which specify the price, conditions, and hours at which water may be drawn. These water rights, known as mill-powers, are appurtenant to real estate originally sold by HWPC or Hadley. The canal system serves fourteen customers in Holyoke and delivers water to four hydroelectric installations there. In South Hadley a short canal provides process water to two plants. The district steam system supplies industrial establishments and certain of HWPC's industrial rental properties.

Only a few parcels of unimproved land remain from the original 1,100 acres acquired in 1859 from Hadley. HWPC has purchased other land in Holyoke, Chicopee, and South Hadley primarily for industrial development.

E.   Prior Classifications of HWPC — Statutory Regulation.

From 1903 through 1936, HWPC was classified by the Commonwealth as a business corporation. In 1937, following the enactment of St. 1936, c. 362, § 1, and St. 1937, c. 383, § 1 (fn. 2, 3), exempting from local taxation the machinery of a domestic manufacturing corporation (and defining that term in the same way as in St. 1930, c. 220, § 5, see fn. 17), HWPC was classified by the Commissioner as a domestic manufacturing corporation and has been so classified in every year. Since at least 1927, HWPC has filed an annual certificate of condition as required of each business corporation by G. L. c. 156, § 47 (as amended through St. 1962, c. 750, § 27).[9]

---

The major part of the total investment is in electrical and steam plant and machinery. The bulk of the electric revenues are attributable to the output of its Mt. Tom Power Plant which first went into operation in 1960.

[9] The board also found that HWPC's decision in 1957 to construct its Mt. Tom Plant was greatly influenced by HWPC's classification as a manufacturing corporation. The exemption from local taxation of its machinery

F. PARTIAL REGULATION OF HWPC UNDER G. L. c. 164.

HWPC is subject to G. L. c. 164 to the extent that it applies to manufacturing companies engaged in the manufacture and sale or distribution of electricity. Annual returns to the D.P.U. filed by HWPC for the years 1963 and 1964 are of a type required to be filed by such manufacturing companies (G. L. [Ter. Ed.] c. 164, § 83), as well as by electric companies. Such manufacturing companies, however, are not subject to c. 164, § 94 (as amended through St. 1963, c. 615, § 1), requiring electric companies to file rate and price schedules. HWPC's contracts to supply electricity to municipal plants (c. 164, § 56D, as inserted by St. 1960, c. 643) and to electric companies (c. 164, § 94A, as amended through St. 1941, c. 400, § 1) are subject to D.P.U. approval. The purchasers, in any event, are subject to regulation under c. 164. General Laws (Ter. Ed.) c. 164, §§ 81, 82, 83, 84 and 84A (as inserted by St. 1934, c. 202, § 1), also apply to such manufacturing companies as well as to electric companies.[10]

---

permitted it to obtain financing for construction on a more favorable basis under G. L. c. 156 than would an electric company subject to the limitations imposed on bond issues by G. L. c. 164, § 13. Due to these advantages HWPC was able to compute lower estimated prices for the electricity to be produced by the proposed new plant and was thus able to induce two electric companies to purchase the bulk of the electricity. Agreements were made among HWPC, New England Power Company, and Western Massachusetts Electric Company, whereby HWPC was to build, own, and operate the new plant but was to sell, and the other two companies were to buy, all except 10,000 kilowatts of the plant's 137,500 kilowatt capacity in the first year of operation; with adjustments thereafter. The plant was then built on land owned by HWPC at a cost of about $24,000,000.

[10] In 1957 and 1958, HWPC's subsidiary, Holyoke Power and Electric Company, asked the D.P.U. under c. 164 for approval of the issue of additional shares, and in 1958 for permission to issue notes. The proceeds of the issues were to be used to reimburse HWPC for construction and other advances. In those cases, HWPC also asked the D.P.U. under c. 164, § 17A (as amended through St. 1954, c. 95, § 1, relating to electric companies; see later amendment by St. 1966, c. 340), for approval of the investment of its funds in the issues, respectively. The petitions were heard together on each occasion and the D.P.U. granted the approvals. It may be that the criminal penalty provided by § 17A led to these applications as a matter of caution. The 1966 amendment made § 17A inapplicable to "[a]ny company supplying electricity in bulk which is authorized by special act to engage in manufacture or to construct mills . . . or to otherwise . . . develop real estate for industrial purposes."

G. The Board's Conclusions.

So far as they might be questions of fact, the board made the conclusions just noted about the extent to which HWPC was subject to c. 164, and also concluded (a) that it was not a utility corporation subject to taxation under G. L. c. 63, § 52A; (b) that the circumstance that HWPC was regulated under the Federal Power Act, Sub-chapter II (16 U. S. C. § 824 et seq. [1964]) was "not compelling" on the issue whether it was a "domestic manufacturing corporation" under the Massachusetts statute; and (c) that, in view of all the evidence, HWPC had been properly classified.

1. The principal subsidiary facts found by the board (apart from the board's conclusions from those facts) essentially are not in dispute. They are justified by statutes and by documentary and other evidence. Our duty is to review the decision of the board in accordance with the standards for review set out in G. L. c. 30A, § 14 (8). See G. L. c. 58A, § 13, as amended through St. 1965, c. 597, § 3A, and St. 1968, c. 120, §§ 2–4. *Children's Hosp. Medical Center* v. *Assessors of Boston*, 353 Mass. 35, 39–40. Questions of burden of proof argued by the assessors thus no longer have significance.

The issue of the proper classification of HWPC, presented under G. L. c. 58, § 2,[11] does not directly involve any "exemption" from taxation, although its determination will decide whether in 1964 HWPC was within the provisions of G. L. c. 59, § 5, Sixteenth (3); see fn. 2, *supra*, so that its machinery became exempt from local taxation. See

---

[11] Section 2 (as amended through St. 1958, c. 490, § 1; see later amendment by St. 1965, c. 696, § 1) reads: "The commissioner shall annually, on or before April first . . . forward to each board of assessors a list of all corporations . . . liable on January first . . . to taxation under . . . [cc. 59, 60A, and 63]. Such list shall indicate . . . corporations . . . classified by the commissioner as manufacturing corporations . . . . Any person aggrieved by any [such] classification . . . may . . . file an application with the state tax commission . . . stating therein the classification claimed . . . [proviso not relevant]. A person may appeal [from the commission's decision] to the appellate tax board . . . . The decision of the board shall be binding upon the parties to any proceeding pending or brought before it which involves a tax for the year to which the decision is applicable. For the purposes of this section, 'person' shall include a board of assessors." See G. L. c. 58A, §§ 6 and 13, both as amended.

§ 5, Sixteenth (5), as amended through St. 1957, c. 541. The exemption provided by § 5, Sixteenth, is not a true exemption from taxation but is an integral part of the method of taxation applicable to all the property of a corporation subject to that section. Section 5, Sixteenth, read with the relevant sections of G. L. c. 63, merely determines which governmental unit may impose a tax upon, or measured by, particular property. Property not taxed to a corporation under § 5, Sixteenth, is included in the measure of the excise imposed on the corporation under G. L. c. 63, and thus is indirectly taxed. No special burden rests upon HWPC to bring itself within the limits of the exemption. See *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 553–554.

2. The recital of HWPC's history, statutory and otherwise, amply demonstrates that it (as its brief states), "is itself a strange and unconventional product. It is a hybrid, combining cross strains of business and utility lines" and subject to restrictions which make it unique. We deal seriatim with the arguments bearing upon whether (fn. 3), with all its peculiarities, HWPC constitutes a corporation "organized under or subject to" G. L. c. 156, the general business corporation statute, or is prevented from being subject to that chapter by the exclusions in c. 156, § 2 (fn. 4).

(a) We conclude that HWPC was not organized to carry on a canal company. Even if Hadley was a canal company, the 1859 statute did not make HWPC one. Read in the context of the declining canal traffic, the omission of any reference in the 1859 act to any duty of HWPC to maintain its canals and locks for navigation (fn. 5, last sentence), and the prompt legislative release (St. 1862, c. 150), of any obligations of the Proprietors to maintain their locks and canals, we regard the predominant purpose of HWPC, as expressed in the 1859 act, as being the creation of "a water-power, to be used . . . for manufacturing and mechanical purposes, and to be sold or leased" to others "for like purposes." The power to impose tolls for use of the locks and canals seems to us only incidental to the main purpose.

We recognize that St. 1859, c. 6 (incorporating HWPC), has many resemblances to St. 1845, c. 163, incorporating Essex Company. See *Essex Co.* v. *Commonwealth*, 246 Mass. 242. Nevertheless, the circumstances and form of the 1859 act indicate to us that the primary objective was to create a water power company. It is to be noted that the 1859 statute does not contain any of the numerous provisions designed to protect navigation and river traffic of the 1845 Essex Company statute (see 246 Mass. 242, 244–246). It makes no reference whatsoever to Rev. Sts. (1836) c. 39, containing provisions then generally applicable to canal companies, but does refer to Rev. Sts. c. 38 (manufacturing corporations), and c. 44 (provisions generally applicable to corporations).

We find nothing to change this view in St. 1884, c. 30, confirming the 1883 conveyance of the Proprietors' properties to HWPC. This statute appears merely to ratify a transfer of properties. All obligations of the Proprietors to maintain canal service had ceased long before 1884. See St. 1862, c. 150.

(b) Each corporation excluded by c. 156, § 2 (fn. 4, *supra*), apart from those engaged in banking or in a closely related type of business, is essentially an enterprise of the type generally referred to as a public utility and usually directly subjected to public regulation, such as an insurance company, railroad, street railway, telegraph or telephone company, gas or electric light company, canal, aqueduct or water company, or a cemetery or crematory company. Most such companies are bound to serve the public generally and without discrimination in all or some of their operations.

Chapter 156 is based on St. 1903, c. 437. Section 1 (c) of that statute contained language closely like that found in c. 156, § 2. The Committee on Corporation Laws which drafted the 1903 statute (see St. 1902, c. 335) in its report (Jan. 1903), p. 10, recognized a "sharp distinction between 'public service corporations,' *i.e.*, those corporations which have special rights or franchises and necessarily tend to monopoly, and therefore require constant supervision by

the state, and ordinary business corporations as to which no such principle exists. . . ." See 2 Op. Atty. Gen. 311, 313 (which treated a distributor of gas to certain corporations for resale to the public as not being subject to the supervision of the then existing predecessor of the D.P.U.), rendered in 1902 by the then Attorney General, also a member of the Committee on Corporation Laws. Public utilities usually have had (a) some tendency toward a monopoly and freedom from competition in a particular area, (b) a duty adequately to serve the public in that area, and (c) the obligation to serve at reasonable rates under public regulation. See *Weld* v. *Board of Gas & Elec. Light Commrs.* 197 Mass. 556, 558–559; *Attorney Gen.* v. *Haverhill Gas Light Co.* 215 Mass. 394, 400. See also *Boston Real Estate Bd.* v. *Department of Pub. Util.* 334 Mass. 477, 479.

Under the 1903 act (St. 1903, c. 350, § 1) giving HWPC authority to make electric power, it was not HWPC which was given protection from competition in the sale of electricity but the Holyoke city electric system. HWPC was granted only limited powers to sell electricity to municipalities and to compete with the city for bulk sales (over 100 hp.) by contracts with large customers and for use on their own property. This power was enlarged (St. 1909, c. 152) to include occupants of specified buildings and also (St. 1926, c. 147) its own subsidiary. No express duty to serve these customers was imposed upon HWPC. It was merely given authority to sell to them. All of them could go elsewhere for their electric power if it would be to their advantage to do so.

The absence of any exclusive territory and of any statutory obligation to serve all customers bears upon whether HWPC is an "electric light, heat or power company" within G. L. c. 156, § 2, and the similar language of St. 1903, c. 437, § 1 (c). HWPC contends that this language (and similar language referring to other public utilities) was intended to exclude from coverage by the business corporation statutes only "the individual types of businesses which . . . constituted the public service corporations of

that day." Certainly HWPC, although authorized to engage in a limited distribution of electric power, was in important respects different from the usual local electric company serving exclusively all or most inhabitants of a particular area, subject to a duty to provide their electric requirements at reasonable and regulated rates. HWPC also contends that in 1903, "electric light, heat or power company" in its common statutory usage (see e.g. St. 1887, c. 385, § 10; St. 1890, c. 371; R. L. [1902] c. 121, § 23, c. 122, § 1; St. 1908, c. 534), referred to corporations of the type "commonly known as electric light companies." See *Commissioner of Corps. & Taxn.* v. *Springfield,* 321 Mass. 31, 37–38. See also St. 1908, c. 529, § 1.

As further support for its position HWPC refers to the language in the later part of c. 156, § 2 (see fn. 4, words following point [B]). This language had its origin in St. 1912, c. 586, which provided that each corporation theretofore organized under special act "except corporations which are empowered to manufacture, store, transmit, sell or distribute power, which now is or may . . . become subject to" St. 1903, c. 437 (the then existing general corporation law) might increase or decrease its capital stock in accordance with c. 437. This statute, as originally enacted and as it read in 1964, at least implied strongly that there were corporations formed by special act which made and sold electric power but which were, nevertheless, subject to c. 437 (or its modern counterpart, G. L. c. 156) despite the exclusion of an "electric light, heat or power company" by c. 437, § 1 (c), and by c. 156, § 2, from the coverage of c. 437 and c. 156, respectively. This 1912 statute, so contends HWPC, indicates that power companies (which fall "somewhere in between the public service corporation on the one hand and the orthodox trading or business corporation on the other") were to be subject to the business corporation law (c. 437 or c. 156) but with the Legislature retaining power to control increases or decreases in their capital stock. As has already been stated, the Legislature in fact has exercised this power with respect to HWPC by St. 1924, c. 54,

and in 1938 (St. 1938, c. 183) by permitting HWPC to take action with respect to its stock "pursuant to" G. L. c. 156 "relating to business corporations."

The assessors contend that HWPC is not subject to c. 156, under the exclusions in § 2, but comes far more naturally within the definition of "electric company" found in G. L. c. 164, § 1, as "a corporation organized . . . for the purpose of making by means of water power, steam power or otherwise and selling, or distributing and selling, electricity . . . or authorized by special act so to do, even though subsequently authorized to make or sell gas." [12] The assessors point out that this definition contains no express requirement that a corporation within its scope have any exclusive franchise or monopoly. Its language, apart from the history of a somewhat separate legislative and administrative treatment of HWPC (and possibly also a few similar hybrid power companies; see e.g. 1913 House Doc. No. 1925, pp. 3–5, 11–17), reasonably describes HWPC and other companies engaging in the manufacture of electricity and its sale in bulk.

The legislative history of what is now G. L. c. 164 (manufacture and sale of gas and electricity) shows some recognition of the prior separate treatment of (a) local electric light companies and (b) power or transmission companies restricting "their trading with private customers to those whose use of electricity is mainly for . . . 'power.' " See 1913 House Doc. No. 1925, p. 14. General Laws c. 164 had its origin in St. 1914, c. 742. Section 1 of this 1914 statute defined "electric company" (apart from the final clause, "even though subsequently authorized to make or sell gas") in precisely the words now used in c. 164, § 1.

---

[12] Another definition found in c. 164, § 1, is "Supplying electricity in bulk" which is "engaging in the business of making and selling or distributing and selling electricity to electric companies, railroads, street railways or electric railroads, or to municipalities for municipal use or re-sale to their inhabitants, or to persons, associations or corporations under limitations imposed by special law or under section ninety or corresponding provisions of earlier laws.'' This definition was not struck from the bill which eventually became St. 1914, c. 742, when that bill was revised to exclude the definition of "transmission company" found in 1913 House Doc. No. 1925, p. 30, referred to below.

The 1914 act was based indirectly upon a special report of the Board of Gas and Electric Light Commissioners submitting (pursuant to Res. 1912, c. 51) a consolidation of the general laws pertaining to the manufacture, transmission, distribution, and sale of gas and electricity. See 1913 House Doc. No. 1925. In the legislation, then recommended by a majority of the three member board (with one member dissenting on the issue), there would have been a clear decision to regulate, under the proposed chapter, each "transmission company" (defined, p. 30, in the bill as a "corporation organized . . . for . . . engaging . . . in the business of supplying electricity, in bulk only . . ."). The recommended bill defined "electric company" as one "organized . . . for . . . making and selling, or distributing and selling electricity." In the Senate (1913 Senate Journal, pp. 1548, 1596) a new draft, 1913 Senate Bill No. 581, was substituted and then referred to the next annual session. The new draft omitted the definition of "transmission company" and retained only what is essentially the present definition of "electric company" (G. L. c. 164, § 1) and the definition of "supplying electricity in bulk." See fn. 12. The new draft, in essentially the same form with respect to the relevant definitions, was put before the 1914 Legislature and was the basis of St. 1914, c. 742. See 1914 Senate Bills Nos. 129, 575.

If the board's recommended bill had been enacted, there would have been specific historical reason for treating hybrid companies like HWPC as subject to G. L. c. 164 rather than to c. 156. The change, however, leaves the legislative intent cloudy and at least suggests that the Legislature made a conscious decision not to treat any hybrid company as an "electric company." [13]

---

[13] Our cases shed little light on whether c. 164, § 1, includes the hybrid companies within the term "electric company." In *Holyoke Water Power Co.* v. *Holyoke*, 349 Mass. 442, 447, a controversy between HWPC and the city electric department over alleged rate discrimination by the latter, we referred to HWPC as "a competing regulated public utility." Examination of the original papers in that case shows that little or none of the long history of HWPC, fully disclosed in the present case, was then discussed in the briefs. The quoted language thus has slight significance.

(c) None of the special acts affecting HWPC expressly give it the right "to take land . . . by eminent domain." If HWPC is an "electric company," it had that right in 1964 under G. L. (Ter. Ed.) c. 164, § 72 (see later amendment by St. 1965, c. 457). If it is not an "electric company," § 72 would not seem to apply to HWPC at all. See *Sudbury* v. *Department of Pub. Util.* 343 Mass. 428; also 351 Mass. 214; *Framingham* v. *Department of Pub. Util. ante*, 138.

(d) HWPC had various poles (for use in transmitting electricity) in public ways in Holyoke as did the city electric department. These locations were granted to HWPC in 1905 and 1959 by the city.[14] The authority for them arose under St. 1903, c. 350, § 3 (see fn. 6, and related text).[15] The assessors contend that the authority to maintain these poles within the meaning of G. L. c. 156, § 2, constituted (1) the power "to take land within the commonwealth by eminent domain," viz. to take the rights of owners of abutting land, and (2) the right to "exercise franchises in public ways granted by . . . any . . . city" (see fn. 4, *supra*).

We think that HWPC's right to obtain pole locations in the streets (with the permission of the mayor and aldermen of a city in competition with it) is not an explicit grant (see *Jenks* v. *Mayor and Municipal Council of Taunton,*

[14] HWPC points out that the pole locations were granted to it by the city only after the city had exacted a consideration. In 1905, HWPC was required to agree to sell (on request) to the city electricity in less than 100 hp. lots and to grant the city certain easements for gas mains. In 1959, new locations were granted only upon the condition that city department wires might be placed on the same poles.

[15] The power granted was subject to R. L. c. 122, §§ 1–5, and c. 121, §§ 26, 27; see now G. L. c. 166, §§ 21, 22, 29; c. 164, §§ 87–88. Chapter 122, § 1, gave certain companies authority "under the provisions of the following sections" to "construct lines . . upon and along the public ways and across any waters." Section 2 provided that the mayor and aldermen "shall give the company a writing specifying where the poles may be located, the kind of poles and the height at which, and the places where, the wires may run." Sections 3, 4, and 5, provide for the assessment of damages to owners of abutting land. Chapter 121, § 26, provided that in a "city . . . in which a . . . person is engaged in the manufacture or sale of electric light no other person . . . shall . . . maintain . . . over or under the streets . . . any wires for the transmission of electricity for light, heat or power . . . [except street railway wires] without the consent of the mayor and aldermen." Section 27 permitted a person aggrieved by the decision of the mayor and aldermen to appeal to the board of gas and electric light commissioners.

227 Mass. 293, 296) of the power to take land "by eminent domain" in the sense in which that phrase is ordinarily used. It is at most a permit (see *Metropolitan Home Tel. Co.* v. *Emerson*, 202 Mass. 402, 404–405) to use a part of the broad public right in the highway which already has been acquired by the city in some manner. See *New England Tel. & Tel. Co.* v. *Boston Terminal Co.* 182 Mass. 397, 399–400. It would take more specific language in c. 156, § 2, to lead us to conclude that the statutory opportunity to ask for this type of permit was a power of eminent domain sufficient to exclude the applicant from coverage by c. 156.

Similarly, we think the permit does not rise to the status of a franchise in public ways, as that term is used in c. 156, § 2. See *Metropolitan Home Tel. Co.* v. *Emerson, supra.* The grant of pole locations by the mayor and aldermen imposed on HWPC no general obligation to serve all the public either in the area of the poles or anywhere. It, in effect, was a grant of a mere permit, for which the city's representatives, by negotiation, obtained concessions from HWPC for the benefit of the city's own electric department.

(e) HWPC can hardly deny that it is subject to G. L. c. 164 in various respects. For example (see fn. 10, and related text of this opinion), some sections of c. 164 are applicable to all manufacturing companies incidentally selling electricity.[16] HWPC's subsidiary is an "electric company." We assume that HWPC's contracts with it and with other electric companies may require D.P.U. approval. Also, St. 1903, c. 350, § 3 (fn. 6, *supra*), subjects HWPC to all general laws applicable to corporations engaged in the manufacture or sale of electricity for power, except street railways.

All these aspects and others in which HWPC is plainly governed to some extent by c. 164 do not necessarily pre-

---

[16] Sections 81, 82, 83, 84, and 84A expressly apply to electric companies and manufacturing companies or persons engaged in the manufacture and sale of electricity.

clude it from also being subject to c. 156.   The legislative
history of St. 1914, c. 742, the predecessor of c. 164, in some
degree differentiates these hybrid companies from an.
"electric company."   The Legislature has twice made
HWPC subject to specific provisions of G. L. c. 156, and
has rejected efforts (see fn. 7) to subject it to c. 164 in these
respects.   HWPC was once mainly a hydraulic power
company and has emerged principally as a distributor of
electric power.   It has been and still is developing real
estate.   On balance, we think that it can reasonably be
regarded as "subject to" c. 156 in a general sense, and as
not excluded from the impact of that chapter by any of
the provisions of c. 156, § 2.

As HWPC has developed over the years, there would
now seem to be little practical reason for treating it as
essentially different from the average local electric utility
company clearly included as an "electric company" under
c. 164, § 1.   Nevertheless, differences do exist and there
has been long and persistent legislative and administrative
disposition to regard HWPC as other than an "electric
company" and continued dealing with it under the business
corporation law.   There has obviously been some HWPC
reliance upon this legislative and administrative attitude
(fn. 9).

3. The assessors contend that, even if HWPC in a general
sense is subject to c. 156, it is not the type of corporation
which the Legislature by St. 1936, c. 362, and St. 1937,
c. 383 (see fns. 2, 3), intended to be taxed as a "manufac-
turing corporation."   The 1936 statute was based upon the
report of the Special Commission relative to Taxation of
Tangible and Intangible Property (Res. 1935, c. 63), and
the 1937 act was indirectly caused by that report.   The
commission was concerned about unemployment caused by
declining manufacturing activities.   It proposed that the
local tax on machinery be eliminated to afford relief to
factories.   See 1936 House Doc. No. 143, p. 5–6, 28–29.
The report accepted without specific discussion the defini-
tion of "manufacturing corporation" then found in G. L.

(Ter. Ed.) c. 63, § 38C, inserted by St. 1930, c. 220, § 5.[17]

The first statute adopted (St. 1936, c. 362) after the 1936 commission report was supplemented by St. 1937, c. 383, which was designed to eliminate the machinery deduction (fn. 17) theretofore used in computing the excise on manufacturing corporations. See 1937 House Docs. Nos. 96 (pp. 3-4), 101.

The proponent of the 1937 legislation was the then Commissioner of Corporations and Taxation. He, in his official capacity, ruled on January 8, 1937, that HWPC "is classified as a manufacturing corporation and hence is not taxable locally on machinery." This ruling almost contemporaneous with the introduction (December 2, 1936) of his recommendation (1937 House Doc. Nos. 96, 101) for the 1937 amendment (approved May 28, 1937) is persuasive indication that the scope of "manufacturing corporation" was intended to be broad enough to include HWPC, and that at least its author thought that HWPC was a "manufacturing corporation."

Undue weight, of course, is not to be given to administrative interpretations of statutes which are not ambiguous. Where, however, the language of a statute is vague or permits more than one reasonable interpretation, contemporary administrative construction, especially if long continued,

---

[17] In 1930 (as a consequence of the confusion of the then existing method of taxing national banks by the decision in *Macallen Co.* v. *Massachusetts,* 279 U. S. 620) business corporations were divided into two classes, and manufacturing corporations were separately classified. See Nichols, Taxation in Massachusetts (3d ed.) pp. 549–562, 612–613, esp. pp. 560, 612–613. A special machinery deduction from the corporation excise was made available to manufacturing corporations, by the 1930 form of § 38C. As then enacted, its first sentence read, "Every corporation organized under or subject to . . . [c. 156] *which is engaged in manufacturing* shall, for the purposes of this chapter, be deemed to be a domestic manufacturing corporation" (emphasis supplied). See 1930 House Bills Nos. 714, 1140. This sentence was not changed in St. 1937, c. 383, § 1 (see fn. 3). The italicized words had originally read (1930 House Bill No. 714, p. 4) "the principal business of which is manufacturing." The change in the language before enactment indicated that less manufacturing activity was to be required to make a company a "manufacturing corporation" than would have been necessary under the original bill. Nothing else in the legislative history of the 1930 act assists in deciding whether a hybrid like HWPC was intended to be classified as a manufacturing corporation.

is of significance. See *Cleary* v. *Cardullo's Inc.* 347 Mass. 337, 343–345. We give this administrative interpretation weight here, where the applicable statutes and the long and perplexing statutory and business history of HWPC leave the situation uncertain.

4. The result reached by the State Tax Commission and the board seems to us to be consistent with the way in which HWPC has been treated by corporation and tax administrative officials for well over a half century. That result is permitted by the applicable statutory language. It does not appear to have been contested by the assessors and their predecessors for many years after 1937, although, we assume, they are not estopped now to take a different position. See *Ferrante* v. *Board of Appeals of Northampton*, 345 Mass. 158, 162–163.

We recognize that there may be some anomaly in taxing HWPC, now developed into predominantly a producer and distributor of electric power, in a manner different from the taxation of corporations wholly engaged in distributing electricity. We conclude, however, that the Legislature, by somewhat obscure enactments, and administrative officials, by interpretation, have established such a different method of taxation for HWPC. If it is to be changed after many years, it is a matter for the Legislature and not the courts.

5. The decision of the Appellate Tax Board is affirmed.

*So ordered.*